## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

COURTNEY L.,[1]

             Plaintiff,

v.                                        Action No. 2:23cv111

KILOLO KIJAKAZI,
Acting Commissioner of
Social Security,

             Defendant.

### UNITED STATES MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Courtney L. ("plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 6. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF No. 8) be **DENIED**, and the decision of the Commissioner be **AFFIRMED**.

### I.      PROCEDURAL BACKGROUND

Plaintiff initially applied for SSI on July 6, 2017.[2] R. 197–202. Plaintiff alleges disability

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

beginning November 7, 2016.[3]  R. 307.  Plaintiff alleges disability due to multiple physical and

mental impairments.  R. 235.  After the state agency denied her claim both initially and on

reconsideration, R. 79–95, 111–128, plaintiff requested a hearing before an Administrative Law

Judge ("ALJ").  R. 173–74.  ALJ Richard Zack held a video hearing on August 16, 2019, R. 58–

78, and issued a decision denying benefits on September 9, 2019.  R. 13–27.  On February 10,

2020, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 1–7.

On May 21, 2021, this Court vacated the decision of the Commissioner and remanded the

case to the Commissioner for further proceedings.  R. 1296–98.  Thereafter, the Appeals Council

directed an ALJ to provide plaintiff an opportunity for a new hearing, take any further action

needed to complete the administrative record, and issue a new decision.  R. 1308.  Accordingly,

ALJ Monica Flynn held a video hearing on November 2, 2022, R. 1206–30, and issued a decision

denying benefits on November 28, 2022.  R. 1179–97.  As a result, ALJ Flynn's decision stands

as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h),

1383(c)(3); 20 C.F.R. § 416.1481.

Having exhausted administrative remedies, plaintiff filed a complaint on March 23, 2023.

ECF No. 1.  In response to the Court's order, plaintiff filed a motion for summary judgment on

June 16, 2023, ECF No. 8, and the Commissioner filed a brief in support of the decision denying

benefits on July 17, 2023, ECF No. 10.  Plaintiff did not reply.  As oral argument is unnecessary,

this case is ripe for a decision.

---

[3] Plaintiff initially claimed to have been disabled beginning on June 1, 2003, but amended her
alleged onset date to July 6, 2017, ahead of her first administrative hearing in August 2019.  R. 80,
197, 307.  In advance of the second administrative hearing in November 2022, plaintiff amended
her alleged onset date to November 7, 2016.  R. 1451.  At the hearing, counsel for plaintiff
acknowledged that, even if plaintiff was found disabled as of November 2016, no benefits would
be retrospectively awarded before the application date, July 6, 2017.  R. 1210.

## II.   RELEVANT FACTUAL BACKGROUND

Plaintiff presents one issue on appeal, arguing that "[t]he ALJ erred by not considering the awarding of a closed period of disability from November 7, 2016, to March 13, 2019." Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br."), ECF No. 9, at 11.   The Court's review of the facts below is tailored to this argument.[4]

### A.   *Background Information and Hearing Testimony by Plaintiff*

Plaintiff, represented by counsel, testified by telephone before ALJ Flynn on November 2, 2022.  R. 1206–30.  Plaintiff was born in May 1985 and was 31 years old as of her alleged onset date of disability in November 2016.  R. 1208; *see* 20 C.F.R. § 416.963.  Plaintiff has a GED degree and has taken some college classes.  R. 1214, 1220.  She has no past relevant work history. R. 1215, 1223.  At the time of the hearing, plaintiff was living with her boyfriend and his mother. R. 1215.

Plaintiff testified that bipolar disorder and anxiety are the mental health problems that affect her life the most.  R. 1216.  The symptoms that plaintiff experiences from her bipolar disorder vary, but include depression, moodiness, at times being overtired and other times being unable to sleep, and having "strange thoughts in [her] head."  *Id.*  Plaintiff testified that these thoughts "come out of nowhere," occurring once every couple of weeks to once every few months, and lasting anywhere from three days to a month.  R. 1217.  Plaintiff also stated that any time when she is not manic, she is depressed.  *Id.*  At the time of the hearing, plaintiff was receiving psychiatric treatment from Western Tidewater Community Services Board, and was taking medication to help with nightmares and flashbacks.  R. 1218, 1221.

---

[4] In closed period cases, the ALJ should consider evidence within the closed period of disability to determine whether Plaintiff was entitled to benefits for that limited duration. *See Adkins v. Berryhill*, No. 3:17cv01927, 2017 WL 3781167, at *4–5, 11–12 (S.D.W. Va. Aug. 9, 2017).

Plaintiff testified that she has lower back pain, although it has gotten slightly better. R. 1219. Plaintiff also stated that her "diabetes is not going well," as she is having a hard time controlling her insulin pump. *Id.* In her functional report, plaintiff stated that she sometimes goes a day at a time without sleeping when having a manic episode, and that it is difficult for her to perform household chores and basic daily tasks due to "depression, physical pain, or exhaustion." R. 247–49.

Plaintiff occasionally went out to run errands, but would need to take breaks due to anxiety and panic attacks that would result from being out of the house and around too many people. R. 1221–22. Plaintiff described her boyfriend and his mother as her main support system, testifying that her boyfriend's mother helps to make sure plaintiff takes her medicine and calms her down when plaintiff's "mind starts going to . . . bad places." R. 1217–20. Plaintiff also testified that her mother helped plaintiff keep her medical history together. R. 1218. Plaintiff stated that her hobbies include watching television, writing, and reading, although the latter two are impacted by her mood. R. 250. Plaintiff wrote in her functional report that she could focus on a task anywhere from 30 seconds to 20 minutes, that she follows written instructions "fairly well," and that she does not follow oral instructions very well due to memory issues. R. 251.

**B.    *Hearing Testimony by Vocational Expert***

Gina Baldwin, a vocational expert ("VE"), also testified. R. 1222–27. In response to the ALJ's hypothetical[5], VE Baldwin testified that such a person could perform light work in the

---

[5] The hypothetical prescribed no more than light work based on an individual in their mid-30's with a high school education and no past work who is limited to: (1) occasional climbing; (2) frequent balancing, stooping, kneeling, crouching, and crawling; (3) limited exposure to workplace hazards such as unprotected heights and moving mechanical parts; (4) simple, routine, and repetitive tasks, but not at a production rate pace, so no assembly line work; (5) frequent interaction with supervisors; (6) occasional interaction with coworkers and the public; and (7) simple work-related decisions. R. 1223–24.

national economy, including work as a sorter, garment tag stringer, and hand bander. R. 1224. VE Baldwin also testified that, if the individual could never interact with the public and required an additional eight percent of time off task in an eight-hour workday, the person would still be able to perform the identified jobs. *Id.* However, VE Baldwin testified that, if the hypothetical individual did not show up for work two days per month, in addition to the other limitations, all employment would be precluded. R. 1224–25. Further, VE Baldwin testified that, if the individual called out of work only one and a half days per month, that would be tolerated up to six times, at which point employment would be terminated. R. 1225–27.

In response to plaintiff's attorney's question about off-task allowance, VE Baldwin testified that the hypothetical individual could maintain competitive employment even being off-task fifteen percent of the day or more. R. 1227.

## C.   *Relevant Medical Record*

### 1.   *Treatment and Medical Source Statement of Sarah Moore, M.D., Churchland Psychiatric Associates*

Plaintiff met with Sarah Moore, M.D., her psychiatrist, at Churchland Psychiatric Associates approximately 16 times for medication management between November 2016 and January 2019. R. 553–61, 941–43, 994–97. During these visits, Dr. Moore described plaintiff as alert and cooperative, with good judgment, logical thought processes, adequate concentration, and congruent affect. *See, e.g.*, R. 553–55. Dr. Moore often noted that plaintiff possessed an adequate memory, *see, e.g.*, R. 553–56, with one exception where she described plaintiff's remote memory as impaired. R. 557. Dr. Moore also described plaintiff as having either good or fair insight during the visits. *See, e.g.*, R. 553–61. Plaintiff's mood varied between appointments, sometimes presenting as euthymic, *see, e.g.*, R. 554, 560, 994, while more often presenting as depressed. *See, e.g.*, R. 555, 561, 943. Dr. Moore also described plaintiff's mood as anxious on a number of

occasions. *See, e.g.*, R. 556–57, 559–60, 942. Notably, during plaintiff's last two visits in September 2018 and January 2019, Dr. Moore described plaintiff's mood as euthymic and noted that plaintiff was "[h]aving more good days. A bit more energetic. Has been more anxious. Sleeping 6–7 hours at night." R. 994–95. Also, with the exception of one visit where plaintiff's motor behavior was hypoactive and her speech slow, R. 553, Dr. Moore described her motor behavior as within normal limits and her speech as spontaneous. *See, e.g.*, R. 554–61.

Plaintiff and Dr. Moore discussed her physical and mental symptoms, including seizures, visual and auditory illusions, GI issues, anxiety, aggression, and sleeping issues. R. 553, 556–59, 942–43, 995. They also discussed plaintiff's living situation, relationship status, and financial difficulties. R. 560, 941, 994, 997. In June 2018, plaintiff described having thoughts of suicide, but denied a plan or intent. R. 997. In July 2018, plaintiff reported that her dysphoria was better, she had more energy, her sleeping had improved, and that she was feeling more optimistic. R. 996. Throughout treatment, Dr. Moore prescribed plaintiff with Xanax, Luvox, Risperdal, Claridine, Cymbalta, Klonopin, Prozac, Buspar, Ambien, and Prazosin. R. 553–561, 941–43.

On May 31, 2018, Dr. Moore completed a medical source statement, stating that plaintiff's symptoms include anhedonia, sleep disturbance, feelings of guilt, disturbed mood, mood swings, decreased energy, malaise, memory loss, isolation/emotional withdrawal, persistent anxiety, anxiety attacks, and delusional thinking.[6] R. 945. Dr. Moore indicated that plaintiff had marked impairments in maintaining concentration and focus, performing at a consistent pace, responding to changes in routine, and dealing with normal work stress. *Id.* Further, Dr. Moore found plaintiff had moderate impairments in getting along with co-workers, supervisors, and the general public,

---

[6] Dr. Moore also wrote a letter in June 2012 stating that plaintiff was unable to work, but this letter is outside the relevant time period. R. 308.

and only a mild impairment in carrying out short and simple instructions. *Id.* Lastly, Dr. Moore estimated that plaintiff would be absent from work "4+ days" per month due to mental health problems. *Id.*

### 2.    *Treatment with Behavioral Health Navigators*

Plaintiff saw Logan Ellington-Harrison, L.C.S.W., with Behavioral Health Navigators ("BHN") for approximately 39 therapy sessions between January 2017 and June 2018.  R. 807–902, 947–59.  During treatment, her mood varied.  At some sessions plaintiff presented as sad and depressed, *see, e.g.,* R. 826, 891, 894, at others she presented as elated and euphoric, *see, e.g.,* R. 834, 850, 882, and still at others as labile, *see, e.g.,* R. 807, 817, 951.  Plaintiff was often described as alert and awake, *see, e.g.,* R. 834, 841, 843, while on only a few instances she was described as drowsy, R. 817, 824, 826, 839.  Her attention and memory were almost always noted to be intact, *see, e.g.,* R. 894, 897, with the exception of one session where each was described as impaired, R. 900.  She was often noted to have poor insight and impaired judgment, *see, e.g.,* R. 875, 882, 888, although on some occasions each was described as intact, *see, e.g.,* R. 891, 894.  Moreover, her appearance, eye contact, speech, affect, and thought process varied depending on the session.  *See generally* R. 807–902, 946–959.

During plaintiff's therapy sessions, the topics of discussion often included the physical pain that she regularly deals with, as well as difficulties with her family.  *See, e.g.,* R. 826, 828, 839, 846, 850, 869, 875.  Other stressors in plaintiff's life included frustrations with her boyfriend, low motivation impacting her ability to get things done, and an inability to live on her own due to insufficient financial resources.  *See, e.g.,* R. 854, 856, 871, 947, 949, 951.  Plaintiff's therapist often assessed that plaintiff struggles to accept the consequences of her choices and noted that the

treatment plan was to "explore feelings and triggers as well as hold her accountable for her choices." *See, e.g.*, R. 857, 870–872, 876.

### 3.    *Treatment with Harmony Wellness*

Plaintiff also treated with Harmony Wellness for therapy and medication management from August 2018 to June 2022.[7]    R. 1120–75, 2007–47.    During therapy, plaintiff discussed relationships with her significant other and her parents. *See, e.g.*, R. 1132, 1136–37, 1142, 1144–46. Plaintiff often reported feeling depressed. *See, e.g.*, R. 1135.    However, after being prescribed medication in April 2019, she shortly thereafter reported "feeling much better with the new medicine." R. 1150.    Her mother also stated that "she's 100% different than before we first saw you." *Id.*

Throughout the therapy sessions within the closed period, Logan Harrison, L.C.S.W., consistently found that plaintiff was oriented to person, time, and place, was able to use decision-making strategies, knew her own age, was able to direct attention, and was able to read. R. 1120–26, 1128–37, 1142–48, 1161–62.    Moreover, on multiple occasions Mr. Harrison assessed that "[plaintiff] continues to struggle with insight and making choices that impact her progress." *See, e.g.*, R. 1142–48.    Accordingly, the treatment plan was to offer plaintiff a safe space to explore her feelings and choices. *Id.*

---

[7] Plaintiff argues for a closed period of disability from November 7, 2016, to March 13, 2019, conceding that "[s]ince March 20, 2019, the objective psychiatric and psychological exam findings have, with occasional exceptions . . . been more within normal limits including overall improved insight and thought content." Pl.'s Br. 6, 15.    Accordingly, the Court focused on the treatment within the closed period.

### 4. Bon Secours Neuroscience Center for Pain Management

Plaintiff treated with Bon Secours Neuroscience Center for Pain Management from August 2016 to April 2018.[8]  R. 322–442, 961–93.  Plaintiff presented for "chronic pain," including migraine headaches, pseudotumor cerebra, bilateral TMJ, lumbar spondylosis with degenerative disc disease, and radiculopathy. R. 331.  Plaintiff was noted to exhibit decreased range of motion, tenderness, pain and spasms in her right shoulder, cervical back, and lumbar back.  R. 332, 356, 406, 431.  Neurologically, she was reported to be alert and oriented, to have an antalgic gait, and to have no cranial nerve deficit.  R. 333, 356, 406, 432, 976.  Plaintiff was noted to be on several medications, including oxycodone, however she stated in September 2016 that she "would like to try and wean off her medication" and "would like to 'deal' with her pain."  R. 355.

In March 2017, plaintiff stated that she takes the oxycodone sparingly although she reported "about 60–75% pain relief when she takes the medication."  R. 377.  In April 2017, it was noted that her "[p]ain has been averaging 5 out of 10 with reasonably good control overall," and that her "[p]hysical activity and mobility are fair, mood and sleep are poor to fair."  R. 405.  In August 2017, plaintiff had not been on pain medication since May, and her pain was more severe as a result. R. 430.  In April 2018, plaintiff's final appointment within the closed period, plaintiff "endorse[d] chronic and worsening lower cervical and upper thoracic pain," as well as "occasional pins and needles and numbness of both arms."  R. 972.  She also described feeling clumsy on her feet and walking with a more unsteady gait.  Id.  Evaluating plaintiff's reported back pain, James Henick, M.D., assessed that plaintiff should respond well to lumbar radiofrequency neurotomy

---

[8] Plaintiff also received a second round of pain management from July 2019 to February 2021 with Winke Orthopedic Pain Management Center. R. 1669–84.  However, as the second round is outside the closed period and plaintiff acknowledges that "the objective physical exam records comparatively found improvement," the Court declines to review the second round of pain management treatment. Pl.'s Br. 7.

procedures for her lower back pain. *Id.* Regarding plaintiff's report of neck and thoracic pain, Dr. Henick "believe[d] it [was] reasonable, especially given the fact that patient has had several seizures including several falls," but opined that she "has somewhat vague upper extremity symptoms." R. 972–73.[9]

### 5.   *Emergency Room Visits*

Plaintiff had two inpatient stays at the emergency room during the closed period, in July 2017 and December 2017.[10] R. 495–518. On July 19, 2017, plaintiff was admitted to the Sentara Belle Harbour Emergency Department for "disorientation," with her chief complaints being "altered mental status" and "gait problem." R. 495, 503. To relieve her lower back pain, plaintiff reported taking two to three times her daily prescribed dose of Neurontin, resulting in difficulty walking, "stumbling around, like she is drunk," and becoming sleepier. R. 503. Plaintiff's treating physician noted that her symptoms were "related to [the] increased dose of Neurontin which patient changed herself." *Id.* Plaintiff was discharged on July 21, 2017, agreeing not to increase medication dosages without physician consultation. *Id.*

On December 9, 2017, plaintiff was admitted for two seizures experienced earlier that day. R. 510. The provider notes state that her seizures "were probably due to low seizure medication level," based on her mother's report that she may not be in full compliance with her medication.

---

[9] During the closed period of disability, plaintiff also treated with Virginia Neurology & Sleep Centers, P.C., for seizures, migraines, epilepsy, sleep apnea, R. 448–94, and Enochs Eye Care, P.L.L.C., for eye health and vision, R. 522–49.

[10] Plaintiff also presented to the emergency room on six other occasions outside of the closed period. She presented twice within a two-day period in October 2019 for axilla abscess, R. 1452–1575, once in December 2019 for a migraine, R. 1576–1652, twice in a three-day span in May 2021 for syncope, multiple falls, renal colic, and hyperglycemia, R. 1685–1878, and once in April 2022 for minor burns to multiple fingers, R. 1879–1942.

R. 510, 516.  Plaintiff was discharged three hours later, stating that she would take her regular seizure medication dosage at home upon discharge.  R. 516.

### 6.    *Opinions of State Agency Experts*

In connection with plaintiff's mental RFC, Patricia Bruner, Ph.D., opined on initial review that plaintiff was moderately limited in her ability to:  (1) understand, remember, and carry out detailed instructions;  (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;  (3) complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;  (4) interact appropriately with supervisors, coworkers, and the general public; and (5) respond appropriately to changes in the work setting. R. 91–92.  Dr. Bruner also noted, however, that although plaintiff has social and adaptive limitations, as well as moderate limitations in her ability to understand and remember detailed instructions, and to sustain concentration and persistence, "[these] would not significantly restrict [her] ability to function in a work setting." *Id.*  Further, Dr. Bruner stated that plaintiff "would be able to perform simple and repetitive tasks in an environment that does not require frequent interaction with the public or co-workers."  R. 93.  On reconsideration, Joseph Leizer, Ph.D., agreed with Dr. Bruner's opinions.  R. 124–25.

As to plaintiff's physical RFC, Richard Surrusco, M.D., opined on initial review that she could:  (1) occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; (2) stand and/or walk four hours in day; (3) sit for about six hours in an eight-hour workday; (4) occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; (5) never climb ladders, ropes, or scaffolds; (6) work without manipulative, visual, or communicative limitations; and (7) work in various environments, so long as she avoids concentrated exposure to hazards,

such as machinery and heights. R. 89–90. Dr. Surrosco explained that plaintiff's exertional, postural, and environmental limitations were based on a lumbar X-ray, "reveal[ing] bilateral L4 pars interticularis defects identified with minimal grade 1 anterior spondylolisthesis at L4–5," as well as pain and seizures. *Id.* Further, Dr. Surrosco opined that plaintiff: (1) needs help with personal care; (2) needs reminders to take her medication; (3) can prepare simple meals only; (4) does not do any household chores due to physical pain and depression; (5) does not drive due to anxiety and agoraphobia; (6) can shop online; (7) can walk five minutes before having to stop and rest 5–10 minutes; and (8) walks with a cane and a brace on her knee. R. 90. On reconsideration, Michael Koch, M.D., concurred with Dr. Surrosco's opinions. R. 121–23.

### III.   THE ALJ'S DECISION

To evaluate plaintiff's claim of disability, the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 416.920(a). The ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; and (4) had an impairment that prevents her from engaging in any substantial gainful employment given her RFC.[11] R. 1179–97.

First, the ALJ determined that plaintiff had not engaged in substantial gainful activity since July 6, 2017, the application date. R. 1182.

At steps two and three, the ALJ found that plaintiff's bipolar disorder, anxiety disorder, obsessive-compulsive disorder, PTSD, agoraphobia, epilepsy, diabetes mellitus, migraines, pseudotumor cerebri, degenerative disc disease, and obesity constituted severe impairments. *Id.*

---

[11] The plaintiff had no past relevant work, therefore the ALJ moved directly to step five of the analysis. R. 1195.

The ALJ classified plaintiff's other impairments as non-severe, noting that she considered even the non-severe impairments throughout the decision and when assessing the plaintiff's RFC. R. 1183. Further, the ALJ determined that plaintiff's severe impairments, either singly or in combination, failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 1184–86.

The ALJ next found that plaintiff possessed the RFC to perform light work as defined in 20 C.F.R. § 416.967(b). R. 1186–95. The ALJ also specified the following additional limitations:

> the [plaintiff] should no more than occasionally climb and no more than frequently balance, stoop, kneel, crouch, and crawl. The claimant can be exposed to workplace hazards, such as unprotected heights and moving mechanical parts no more than frequently. The [plaintiff] could perform simple, routine, and repetitive tasks, but not at a production rate pace, meaning no assembly line work; and she could make simple work-related decisions. She could interact with supervisors no more than frequently; with coworkers no more than occasionally; and can never interact with the public. In addition to normal breaks, she would be off-task eight percent (8%) of the time in a normal eight-hour workday.

R. 1186–87.

At step four, the ALJ noted that plaintiff had no past relevant work. R. 1195. After reviewing the Dictionary of Occupational Titles ("DOT") and the VE's testimony, at step five the ALJ determined that plaintiff could perform existing jobs in the national economy, including working as a sorter, garment tag stringer, and hand bander. R. 1196. Accordingly, the ALJ concluded plaintiff was not under a disability from July 6, 2017, through November 28, 2022, and was ineligible for SSI. R. 1197.

## IV.    STANDARD OF REVIEW

In reviewing an ALJ's decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v.*

*Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Johnson*, 434 F.3d at 653.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  Thus, reversing the denial of benefits is appropriate only if either (a) the record is devoid of substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *Id.*

## V.    ANALYSIS

***Substantial evidence supports the ALJ's conclusion that plaintiff was not disabled throughout the relevant time period, including during the closed period of November 2016 to March 2019.***

Plaintiff argues that the "ALJ erred by not considering the awarding of a closed period of disability from November 7, 2016, to March 13, 2019." Pl.'s Br. 11.  In conjunction with this argument, plaintiff contends that she would have been absent from and/or left early from work 2.7 days per month during this time period, which, based on the VE's testimony, means no jobs would

14

exist in the national economy. *Id.* at 13. Further, plaintiff argues that the ALJ's rejection of Dr. Moore's opinion, which found plaintiff's symptoms to support marked mental limitations, is not supported by substantial evidence. *Id.* at 14–15.

The Commissioner contends that plaintiff did not establish eligibility for a closed period of disability and that the "ALJ's decision denying benefits . . . contains an implicit finding that the claimant is not entitled to a closed period of disability." Def.'s Br. in Supp. of the Comm'r of Soc. Sec.'s Decision Denying Benefits and in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Br."), ECF No. 10, at 9–10. Moreover, the Commissioner asserts that "[r]egular medical appointments do not render [p]laintiff disabled[]," and that because the record "depicted no emergent mental health treatment and nothing other than regular mental health maintenance visits . . . the ALJ was permitted to find that [p]laintiff was not precluded from performing sustained work activity." *Id.* at 11, 13. Lastly, the Commissioner contends that substantial evidence supports the ALJ's assessment of Dr. Moore's opinion. *Id.* at 17.

**A.**   ***The ALJ adequately considered all relevant evidence of record within the closed period in determining plaintiff's RFC.***

The ALJ properly evaluated the medical and psychiatric opinions and evidence during the November 2016 to March 2019 time period, concluding that the "evidence does not support the extent of the [plaintiff's] alleged loss of functioning." R. 1188–91. The ALJ first walked through plaintiff's physical impairments, noting that the "record reflects non-compliance with treatment but documents improvement in her symptoms with treatment." *Id.* The ALJ then moved to plaintiff's mental impairments, finding that they too do not support the extent of her allegations. R. 1191–93.

First addressing plaintiff's physical impairments, the ALJ stated that although plaintiff alleges that "the combined effect of the [] impairments has resulted in work-preclusive limitations

since the amended alleged onset date, the [plaintiff's] good physical examination findings overall, her presentation during visits, and her course of treatment do not support this allegation." R. 1188. Considering the seizure plaintiff had shortly after the November 2016 alleged onset date, the ALJ noted that it was thought to have occurred because of nausea, vomiting, and diarrhea that plaintiff was dealing with, "resulting in lower levels of [] medications in her system." R. 1188–89 (referencing Exhibit 6F). The ALJ further noted that plaintiff reported improvement in her headaches, was given medicine to help with nausea and vomiting, and that "[o]ther records from [December 2016] reflect normal motor activity and describe [plaintiff] as alert." R. 1189 (referencing Exhibit 6F). Turning to March 2017, the ALJ stated that plaintiff "reported she was feeling better after weaning off her pain medications," and that plaintiff reported "60–75% pain relief when she takes [oxycodone] sparingly." *Id.* (referencing Exhibit 5F).

The ALJ also pointed out that plaintiff's symptoms appeared normal and showed signs of improvement with regard to her physical impairments throughout the closed period. R. 1189–91. The ALJ found that plaintiff's June 2017 neurology records "describe her general level of motor activity as normal, and despite her reports of fatigue and pain, she generally appears alert, oriented, and comfortable during visits, [and] in no acute distress, which undermines her allegations." R. 1189 (referencing Exhibits 6F, 9F). The ALJ also noted that, in January 2018, plaintiff's lumbar spine showed mild degenerative disc disease, no central stenosis, and no evidence of nerve root compression. *Id.* (referencing Exhibit 16F). Further, in July 2018 an MRI "showed relatively mild multilevel degenerative findings of the cervical spine," with "no cord edema and only mild spinal stenosis." *Id.*

Notably, the ALJ pointed out that plaintiff's records indicate "non-compliance with treatment." R. 1188. Pointing to medical records from April 2017, the ALJ stated that "[w]hile

16

records mention that [plaintiff] has had an excellent response to CPAP treatment, records also mention that she has not always been compliant with this treatment, . . . which undermines the extent of her allegations." R. 1189 (referencing Exhibits 6F, 19F). Moreover, the ALJ noted that, although December 2017 records show ongoing seizure activity, "these breakthrough seizures are noted to have occurred due to low medication levels." *Id.* (referencing Exhibit 9F). Further, the ALJ stated that in March 2018, "[plaintiff] admitted that the ER visits for seizures were due to her not being compliant with her medications." *Id.* (referencing Exhibit 19F). This pattern of noncompliance was noted throughout the closed period timeframe, as the ALJ, citing February 2019 records, stated that "[r]ecords also reflect significant gaps in treatment with other providers and continue to document non-compliance with her prescribed medications, despite reports of improvement [in] her course of treatment." R. 1190 (referencing Exhibit 19F).

Moving on to plaintiff's mental impairments, the ALJ concluded that "the evidence does not support the extent of her allegations." *Id.* The ALJ noted that with respect to her mental impairments, "[plaintiff] has reported improvement on her prescribed medications." *Id.* Moreover, the ALJ stated that although "[h]er symptoms have fluctuated, [] even when she appeared depressed on examination, she presented with normal behavior and normal judgment and thought content." *Id.* (referencing Exhibits 5F, 8F). Specifically discussing the November 2016 amended alleged onset date, the ALJ stated that the "date corresponds with the date of a visit with her psychiatrist . . . during which [plaintiff] reported symptoms of PTSD and appeared dysphoric and anxious, but she was also alert and cooperative and had spontaneous speech, logical thought processes, and normal thought content, with an adequate memory and concentration, and good insight and judgment." *Id.* (referencing Exhibit 8F).

The ALJ found that throughout the relevant period, plaintiff appeared "alert and cooperative during medical visits, in addition to mental health visits." R. 1191. The ALJ noted that in January 2017, plaintiff "stated she felt tired, but she had a normal mood and affect." *Id.* (referencing Exhibit 6F). Further, the ALJ noted plaintiff's "concentration and memory continued to be described as adequate," that she "has reported improvement in her hallucinations on her medications," and that when consistently taking her medicine, plaintiff's "mood appeared a bit bright." *Id.* (referencing Exhibits 6F, 8F, 24F, 26F). The ALJ also found that "despite [plaintiff's] fluctuating mental symptoms, her memory and concentration have continued to be assessed as adequate." R. 1192. (referencing Exhibit 13F). In addition, the ALJ noted that plaintiff's "[m]ental status examination findings reflect improvement on her medications," and also document "future-oriented thoughts." *Id.* (referencing Exhibits 8F, 11F, 13F, 23F). The ALJ found that plaintiff's January 2018 treatment notes describe her "as alert, with an appropriate mood and affect, . . . [and] in no acute distress." *Id.* (referencing Exhibits 10F, 12F, 21F). Moreover, the ALJ opined that November 2018 records support a finding "that she is able to spend time around others without decompensating from a mental standpoint." *Id.* (referencing Exhibit 24F). Furthermore, the ALJ noted that "[i]n early 2019, [plaintiff] pursued a new romantic interest and described her bipolar disorder as pretty well controlled." *Id.* (referencing Exhibits 19F, 25F, 26F). Accordingly, the ALJ adequately considered all relevant evidence within the November 2016 to March 2019 closed period, and substantial evidence supports the ALJ's conclusion that plaintiff was not disabled throughout the relevant period.

Plaintiff argues that, because she raised the issue of awarding a closed period to the ALJ both in her pre-hearing brief, R. 1451, as well as in a pre-hearing conference, the ALJ's failure to specifically address the possibility of a closed period is not harmless error. Pl.'s Br. 11–12 (citing

*Shiplett v. Colvin*, No. 5:15cv55, 2016 WL 6783270, *13 (W.D. Va. Nov. 16, 2016)) ("Failure to consider whether a closed period of disability exists may warrant remand.")   In response, the Commissioner argues that an ALJ's decision denying benefits "contains an implicit finding that the [plaintiff] is not entitled to a closed period of disability within the same period." Def.'s Br. 10.

To qualify for disability benefits, plaintiff need only show that she was disabled for any consecutive 12-month period between her onset date and the date of the hearing.   20 C.F.R. § 416.905(a); *see Calhoun v. Colvin*, 959 F. Supp. 2d 1069, 1075 (N.D. Ill. 2013) ("the disability inquiry must be made throughout the continuum that begins with the claimed onset date and ends with the hearing date, much as though the ALJ were evaluating a motion picture at every frame of that time period instead of . . . a snapshot taken [at] the hearing.").   In support of her determination, the ALJ cited to the record throughout the relevant period, including ample references to evidence within the November 2016 to March 2019 timeframe. *See, e.g.,* R. 1188–92.   Unlike the case plaintiff cites to, where the court found that "the ALJ [did] not provide any meaningful analysis of the evidence in the record, especially pertaining to [plaintiff's] treating physician['s] [] treatment notes; instead, [] merely summariz[ing] the medical evidence without any further explanation," *Shiplett*, 2016 WL 6783270, at *11, here the ALJ performed an in-depth review and analysis of all relevant medical evidence.   Accordingly, the ALJ's analysis of the evidence within the closed period was adequate and is supported by the substantial evidence.

To the extent plaintiff claims that the ALJ erred in failing to explicitly deny a closed period of disability, that argument fails. *See Atwood v. Astrue*, No. 5:11cv002-RLV-DSC, 2011 WL 7938408, at *6 (W.D.N.C. Sept. 28, 2011) (finding that the ALJ was not required to explicitly deny a closed period of disability where the ALJ explicitly determined that the claimant was not disabled from the alleged onset date through the date of the disability decision).   In finding that

19

plaintiff was not disabled from her application filing date of July 6, 2017, through the date of the decision, the ALJ implicitly found that plaintiff also was not entitled to a closed period of disability at any time during that timeframe.  R. 1181, 1197; *see Laws v. Astrue*, No. 3:08cv722, 2009 WL 3270770, at \*7 (E.D. Va. Oct. 8, 2009) (holding the ALJ implicitly found that plaintiff was not entitled to closed period of disability because the ALJ found plaintiff was not disabled through the date of the decision).

Plaintiff further argues that she had 78 appointments from November 7, 2016, to March 13, 2019, which would have precluded any jobs from being available to her based on the VE's testimony, reasoning that she should be found disabled during this 29-month closed period as a result.  Pl.'s Br. 13.  Specifically, plaintiff contends she would have been absent, or left work early, "an average of 2.7 days per month solely due to the frequent need for her psychiatric and/or psychological exams, sessions, and counseling." *Id.* The VE testified that "1.5 to 2 days per month for 6 consecutive months" would be the maximum absences permitted for jobs to exist in the national economy. *Id.* (citing R. 1225–26).  Therefore, plaintiff argues that she should be found disabled during this closed period because her required absences would have exceeded the maximum allowed, according to the VE's testimony. *Id.* In response, the Commissioner argues that regular medical appointments are not an appropriate consideration when determining whether an individual is disabled, and that an individual must be unable to engage in any kind of substantial gainful activity in order to be found disabled.  Def.'s Br. 11–13 (citing 20 C.F.R. § 416.905(a)).

The Court agrees with the Commissioner.  A disability under the Social Security Act is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R.

20

§ 416.905(a).  A plaintiff cannot simply "add[] up the number of doctor visits and phone calls to his doctor he made over the pendency of this case and argue[] that [the] number of absences would preclude employment." *Leaverton v. Colvin*, No. 11cv778-FHM, 2013 WL 1316901, at *3 (N.D. Okla. Mar. 29, 2013).  Rather than merely alleging that she would be required to miss an entire day of work for each medical appointment, or that appointments could not be scheduled around work, plaintiff must show that her impairments amount to a disability.  *Id.*; *see also Baker v. Berryhill*, No. CIV-17-353-BMJ, 2018 WL 1096868, at *4 (W.D. Okla. Feb. 28, 2018) (holding that plaintiff's 75 doctor's visits and 40 surgeries or procedures within a 30-month period did not preclude past work merely because they would have caused plaintiff to be regularly absent over that span).

The ALJ did not err in determining that plaintiff has the RFC to perform light work, subject to certain restrictions.  R. 1186–87.  Moreover, although acknowledging plaintiff's numerous mental health treatment records throughout her decision, the ALJ found that her impairments do not preclude performance of sustained work activity.  R. 1191–93.  Nothing more was required.  *See Cherkaoui v. Comm'r of Soc. Sec.*, 678 F. App'x 902, 904 (11th Cir. 2017) ("The number of medical appointments [plaintiff] attended is not a functional limitation caused by her impairments that would affect her physical or mental capabilities."); *see also Simpson v. Comm'r of Soc. Sec.*, No. 1:09-02731-HFF-SVH, 2011 WL 1261499, at *2 (D.S.C. Mar. 31, 2011) (citing 20 C.F.R. § 416.921(b)) ("Even if [plaintiff] has frequent medical appointments, [p]laintiff can still have the ability and aptitude necessary to work.").  Thus, the ALJ did not err in failing to specifically address the number of psychiatric and/or psychological counseling exams and appointments plaintiff had over the 29-month closed period.

**B.**   ***Substantial evidence supports the ALJ's conclusion that Dr. Moore's opinion was partly unpersuasive as it pertains to marked limitations.[12]***

**1.**   ***The applicable methodology for reviewing Dr. Moore's opinion.***

The ALJ must consider and explain the persuasiveness of each medical opinion in the record.[13]  20 C.F.R. § 416.920c(b); *see* 82 Fed. Reg. 5844, at 5854 (noting that the ALJ should "focus more on the content of medical opinions and less on weighing treating relationships against each other").  ALJ review of medical opinions and findings are based upon: (1) supportability, or the relevance and strength of explanations for the opinion; (2) consistency, or the similarity with other opinions; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the relationship, and extent of the relationship; (4) specialization, relating to the training of the source; and (5) other factors, including but not limited to the source's familiarity with other medical evidence and the SSA's policies and requirements.  20 C.F.R. § 416.920c(a), (c).

In assessing persuasiveness, however, an ALJ's chief task is to decide and explain whether an opinion or finding is supported by and consistent with the record.[14]  *Id.* § 416.920c(b)(2) ("Therefore, [ALJs] will explain how [they] considered the supportability and consistency factors

---

[12] Although the parties only raised the closed period issue, in making the argument for a closed period of disability, plaintiff asserts that "the ALJ's stated reasons for rejecting Dr. Moore's opinion are not supported by the substantial evidence of the record."  Pl.'s Br. 15.  Accordingly, the Court addresses the sub-issue below.

[13] A "medical opinion" is a statement from a medical source about a claimant's limitations and ability to perform physical, mental, and other work demands, and to adapt to a workplace environment, in spite of her impairments.  20 C.F.R. § 416.913(a)(2)(i)–(iv).

[14] Supportability is an internal review that requires an ALJ to consider how "objective medical evidence and supporting explanations presented by a medical source . . . support his or her medical opinions."  20 C.F.R. § 416.920c(c)(1).  By comparison, consistency is an external review that requires an ALJ to determine how "consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources."  20 C.F.R. § 416.920c(c)(2).

22

for a medical source's medical opinions"); *see* 82 Fed. Reg. 5844, at 5853 (describing these as the "two most important factors").   Explanation about the remaining factors is only required when an ALJ concludes that two or more medical opinions are equally supported by and consistent with the record.   20 C.F.R.   § 416.920c(b)(3).   Moreover, the rules dictate review of a provider's opinions on a collective basis, rather than opinion-by-opinion; negating the need for individual treatment of every medical opinion in the record.   *Id.* § 416.920c(b)(1).   This framework guides the Court's review below.

### 2.   *The ALJ committed no error in evaluating Dr. Moore's opinion.*

#### a.   *Supportability*

The ALJ found Dr. Moore's opinion that plaintiff had marked limitations in maintaining concentration and focus, performing at a consistent pace, responding to changes in routine, and dealing with normal work stress to be unpersuasive. R. 1195.  The ALJ found the remainder of Dr. Moore's opinion persuasive as it pertains to mild and moderate limitations.[15] R. 1194–95.  The ALJ found that plaintiff had only a mild limitation in her ability to understand, remember, or apply information, and moderate limitations in her ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself. R. 1185–86.  Ample evidence in the record supports the ALJ's conclusion that Dr. Moore's opinion was unpersuasive with regard to its marked limitation findings.

Dr. Moore submitted a medical source statement on May 31, 2018. R. 945.  Finding the source statement to be partly unpersuasive, the ALJ stated that "[i]n terms of supportability, Dr.

---

[15] Dr. Moore opined that plaintiff had a mild limitation in carrying out short and simple instructions, and moderate limitations in getting along with co-workers, supervisors, and the general public. R. 945.

Moore's records document adequate concentration and memory," which contradicts her opinion that plaintiff has a marked limitation in concentration and focus. R. 1185, 1195. The ALJ noted that plaintiff's treatment notes, "including those going back to the amended alleged onset date, generally reflect an intact, or adequate, memory." R. 1185 (citing Dr. Moore's treatment notes). Further, the ALJ pointed out that neither Dr. Moore's notes, nor the record as a whole, contain any referral for memory testing "to support the extent of [plaintiff's] alleged memory issues." *Id.* Moreover, the ALJ found that although Dr. Moore's treatment notes describe plaintiff as dysphoric and anxious, they also showed that "she was also alert and cooperative and had spontaneous speech, logical thought processes, and normal thought content, with an adequate memory and concentration, and good insight and judgment." R. 1191 (citing Dr. Moore's treatment note on the alleged onset date, November 7, 2016).

In response to Dr. Moore's opinion that plaintiff has marked limitations in maintaining concentration, focus, and a consistent pace, the ALJ noted that Dr. Moore's "treatment notes . . . generally reflect adequate, or intact, concentration and attention." R. 1185 (referencing, *e.g.,* Exhibits 8F, 13F, 17F). The ALJ also stated that Dr. Moore's treatment notes, "reflect an intact, or adequate, memory," and that plaintiff was "alert and cooperative and had spontaneous speech, logical thought processes, and normal thought content" during visits. R. 1185, 1191. Further, the ALJ found it persuasive that even amidst plaintiff's symptoms, Dr. Moore continued to describe her as having "an adequate concentration level," strengthening the ALJ's conclusion that plaintiff can maintain her concentration and pace. R. 1192.

Addressing Dr. Moore's finding that plaintiff has marked limitations in responding to changes and dealing with normal work stress, the ALJ noted that plaintiff "has dealt with various stressors, including those related to her impairments and overall health condition, her financial

24

situation, and her housing situations, without decompensating from a mental health standpoint." R. 1195. The ALJ stated that Dr. Moore's own treatment notes reflect "future-oriented thoughts, as [plaintiff] has expressed a desire to obtain her own living space with her significant other and achieve an improved financial situation." R. 1192 (referencing Exhibit 13F). Further, the ALJ noted Dr. Moore's comment that plaintiff's "mood appeared a bit bright, and she reported a decrease in the frequency of her panic attacks," which is suggestive of being able to cope with normal stress. R. 1191–92 (referencing Exhibit 8F). Dr. Moore's opinion that plaintiff had marked limitations in multiple areas of mental functioning was unsupported by her treatment notes and medical source statement.

Also, the ALJ limited plaintiff to frequent interaction with supervisors, occasional interaction with coworkers, and no interaction with the general public, to give "deference to the [plaintiff's] allegations" and Dr. Moore's findings regarding plaintiff's ability to interact with others. R. 1193. Moreover, out of deference to Dr. Moore's opinion that plaintiff has marked limitations in maintaining concentration, focus, and a consistent pace, the ALJ limited the plaintiff "to making simple work-related decisions," and stated that "in addition to a normal break schedule, she would be off-task 8% of the time in a normal eight-hour workday." *Id.*

### b.    *Consistency*

The ALJ also found that Dr. Moore's opinions were not consistent with the record, stating that "treatment notes document improvement in the [plaintiff's] mental symptoms on her prescribed course of mental health treatment." R. 1195.

With respect to plaintiff's understanding, remembering and applying information, the ALJ found that the plaintiff has "no more than a mild limitation in this domain," noting that her treatment notes reflect a generally intact memory and that plaintiff herself reported receiving good

grades in school.  R. 1185 (referencing treatment notes from Western Tidewater Community

Services Board).  Further, the ALJ noted that while plaintiff "stated that her financial issues affect

her mood, [] her memory, attention, and concentration continued to be described as intact."  R.

1192 (referencing treatment with Behavioral Health Navigators).  Additionally, the ALJ found that

plaintiff's mental health records reflect that "she is able to direct attention, use decision making

strategies, and is able to read."  *Id.* (referencing treatment with Harmony Wellness).

Regarding plaintiff's ability to interact with others, the ALJ noted that plaintiff "has resided

with family members and currently resides with her significant other and his mother."  R. 1185.

Additionally, the ALJ noted that medical records state that plaintiff remained primarily at either

her parents' or her boyfriend's home, but "also mention that she has been dating and spending time

outside of her residence," indicating that she is able to spend time around others.  *Id.* (referencing

Harmony Wellness records).  Moreover, plaintiff "has presented with fluctuating mental symptoms

during visits, . . . but her behavior is still generally described as normal."  *Id.* (referencing Exhibits

5F, 11F, 15F).  Further, the ALJ noted that "[d]uring visits with Dr. S. Mark Enochs, OD, the

[plaintiff] generally presented as pleasant and sociable, with a normal affect."  *Id.* (referencing

Exhibit 31F).[16]

Responding to Dr. Moore's opinion that plaintiff has marked limitations in maintaining

concentration, focus, and a consistent pace, the ALJ noted that although the record contains reports

of hallucinations, they were eliminated with medication.  *Id.* (citing Harmony Wellness treatment

records).  Moreover, addressing reports of fatigue in the record, the ALJ found that this fatigue

---

[16] In addition to citing plaintiff's ophthalmology records, which describe her as "pleasant, sociable, fully alert to time, place, and person, and appeared oriented, with a normal affect," the ALJ also cited to plaintiff's urology records describing her as alert and oriented during visits.  R. 1192 (referencing Exhibits 31F, 34F).

was due to having "not been fully compliant with CPAP treatment . . . and even when she reports a pain level of 8/10, she appeared with a normal mood and affect." *Id.* (referencing Exhibit 32F). As stated previously, the ALJ also accounted for Dr. Moore's findings by limiting plaintiff to making simple work decisions and noting she would be off-task an additional 8% of the time in a normal workday. R. 1193.

Addressing Dr. Moore's opinion that plaintiff has marked limitations in responding to changes in routine and dealing with normal work stress, the ALJ found that these opinions are not consistent with plaintiff's course of treatment, "because the record supports mild-to-moderate mental symptoms overall." R. 1195. The ALJ noted that plaintiff's Harmony Wellness counseling records "reflect concern regarding her finances and contain future-oriented plans regarding obtaining her own apartment and independent housing to get more independence." R. 1186 (referencing Exhibit 23F). Moreover, the ALJ noted that although either plaintiff's mother or plaintiff's boyfriend's mother have accompanied her to appointments, that is because plaintiff "does not drive due to her medical condition and seizures," and is not attributable to an inability to manage stress. *Id.* Additionally, the ALJ remarked that "even when she appeared depressed on examination, she presented with normal behavior and normal judgment and thought content," and that "she generally appears alert and cooperative during medical visits, in addition to mental health visits." R. 1191. These treatment notes, as well as "[s]ubsequent records [that] continue to describe her as appearing alert and oriented on examination," strengthen the ALJ's conclusion that Dr. Moore's opinion is unpersuasive. R. 1193 (referencing Exhibits 38F, 39F).

The ALJ also found that plaintiff's own statements are not consistent with Dr. Moore's opinion that plaintiff has marked limitations in these areas of mental functioning. R. 1192–93. The ALJ noted that in early 2019, plaintiff "described her bipolar disorder as pretty well

27

controlled." R. 1192 (referencing Exhibits 19F, 25F, 26F). The ALJ further remarked that plaintiff "stated she felt her mood had improved since she started [a new medication]," *id.* (referencing Exhibit 26F), and that plaintiff "reported improvement in her hallucinations on her medications," R. 1191 (referencing Exhibits 6F, 24F, 26F). Based on these observations, the ALJ found that plaintiff's statements regarding the limiting effects of her symptoms show that she "appears to be more compliant with her psychiatric medications than some other forms of treatment, and records document improvement on her medications." R. 1193.

Accordingly, the ALJ did not err in her finding that Dr. Moore's opinion was unpersuasive, and substantial evidence supports the ALJ's conclusion that plaintiff was not disabled, including during the closed period.

## VI.    **RECOMMENDATION**

For all these reasons, the Court recommends that plaintiff's motion for summary judgment (ECF No. 8) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

## VII.    **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with

28

a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

  2.  A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

  The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/<br>
Robert J. Krask<br>
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 7, 2023